Grejsen J.
delivered the opinion of ihe court.
The first and principal question to be considered in this case is, as to the constitutionality of the act of the legislature, under which the defendants claim title. The act of 1825, o 154 enacted upon the application of the guardians of the complainants, authorised said guardians to sell the tract of land in controversy for the purpose of raising a fund to pay the debts of complainant’s ancestor. In pursuance of its provisions they proceeded to sell the land on the 18th day of May, 1826, to David and Thomas Steel, to whom a conveyance was made. The Steels sold to James Perry, who took possession of the premises and who has since sold to James W. Wheeler. The bill prays that the deed to the Steels may be delivered up to be cancelled, that the possession of the land may be delivered to complainants, and that defendants account for the rents and profits of the land since they have had possession of it.
It is contended this act of assembly is unconstitutional. 1st. Because it is an exercise, of judicial authority, and 2d, because it deprives the complainants of their property without the judgment of their peers, or the operation of the law of the land. It is clear that the legislature of this State cannot rightfully exercise a judicial power. By the constitution (at th#time this act was passed,) it is provided in art. 5, § 1, “that the judicial power of the State shall be vested in such superior and inferior courts of law and equity, as the legislature shall from time to time direct and establish.” Here the whole of the judicial power of the State having been vested in the courts, the assumption of any such power by the legislature would encroach upon the jurisdiction of another co-ordinate department of the government, would transcend the powers entrusted to it, and would consequently be unconstitutional, and the act would be void. The question then recurs, is the act under consideration of a judicial character? It does not partake oí the character of a law, for it forms no rule of action of that permanent, uniform and universal character which Blackstono in his commentaries, vol. 3, page 1, says constitute the fundamental principles of municipal law. What is it then but a iudioial decree? It was enacted upon the avowed *70 ground that the estate of John Jones deceased was indebted. ° ... does it do then but adjudge the existence of the debts, and decree that the lands be sold for their payment. It is, tobe sure, in torm a law, but we are unable to see how it differs in substance from a judicial decree, and if it is in substance a judicial decree, the form in which its makers have thought proper to clothe it, cannot alter its character.
The legislature cannot sit in judgment, try causes and apply the rules of law to them, make decrees, and much less can they make decrees in the exercise of an arbitrary power, independent of and in opposition to the rules of law. It is difficult to perceive how an act which determines that the property of a party is liable for a given debt, and that it bo sold for the payment of that debt, is not a judicial act; and yet in substance that is the case before us. It is true, the sale is authorised for the payment of debts generally, but that can make no difference as to its judicial character. It is the same thing in principle whether there be ten creditors or only one. We are aware that the supreme court of the United States, in the case of Wilkinson vs. Leland, 2 Peters’ R. 627, and the supreme court of Massachusetts in the case of Rice vs. Parkman, 16 Mass. R. 326, in deciding upon acts somewhat similar, determined that those acts were no encroachment upon the judicial power. But it is to bo observed as to the case of Wilkinson vs. Leland, that the law whose constitutionality was involved, was an act of the legislature of Rhode Island. This State has no constitution, hut is'governed altogether by the-charter of Charles IT. in the argument of the case, Mr. Wirt put the power upon the ground that there was no constitutional restriction to legislative action. “Is it necessary,” said he, “to show the authority? The authority is that of ihe people.” Judge Story, who delivered the opinion of the court, enters into no reasoning upon the subject. Ho says: “We do not think that the act is to bo considered as a judicial act, but as an exercise oflegislation. It purports to boa legislative resolution and not a decree.” Now if this is the best reason which can be given why it was not a judicial act, with deference to the able judge who advances it, the opinion ought to have very bub- weight. If 1.» making an a.-t of this *71 kind purport £o he a legislative resolve, it thereby becomes 1 g ... ... J . a legislative and not a judicial act; all judicial power might be-usurped by the legislature and exercised constitutionally in the form of legislative rcsolyes. In the case of Mice vs. Parkman, chief justice Parker puts it upon the ground that it was not a question in which diiierent parties were interested, nor was it a decree affecting the title to the property. The only object of the legislature in that case was to grant the authority to iranimrntc real into personal property for purposes beneficial to the owner. This view of the case, though constituting a broad distinction between that and the present case, is hardly satisfactory.- Por although usually there are (wo parties in each judicial proceeding, yet this is not always the case. An inquisition of lunacy and the appointment of a committee, is a case of this hind, yet in such case there is an exercise of judicial power and discretion. Put in the case before the court there were two parties; there were parties to the debts which were assumed to exist, and parties to the sale which was au-thorised to be made.
We are next to consider whether this act of assembly is the “law of the land.” By the eighth section of the hill of rights it is declared “that no freeman shall be taken, imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of bis life, liberty or property, but by the judgment of his peers or the Jaw of the land.” Lord Coke in his commentary upon Magna Charta, 2 Institute, 51, in defining the meaning of the phrase “law of the land, ” says: “That the law might extend to all, il-is said per legem lerrae, by' the law of the land,” By this court, in many cases these terms “law of the land,” are defined to mean a general and public law, operating equally upon every member of the community.
It is however contended, that this provision of the constitution was not intended to apply to a case like the present, but was intended to prevent majorities in times of high political excitement from passing partial laws, whereby to create forfeitures of estates and otherwise to destroy obnoxious individuals. It is true no doubt, but that the primary object of the framers of the constitution was to protect individuals in *72 cases I^ce lh°se suggested in tlio argument. But the language" used is of general application and forbids the enactment of a partial law by which the rights of any individual shall be abridged or taken away. lVor is there a single provision in our constitution more salutary in its character, or. that demands in its enforcement the exercise of greater vigilance and energy.
The only means by which the legislature can be kept within the bounds of the constitution in times of high political excitement, is to accustom its members to the restraints it imposes and to check their assumption of an excess of power promptly, whenever the case occurs. If when the public mind is quiet, and public opinion sustains the courts in the dispassionate and impartial exercise of its supervisory power, precedents of constitutional violations shall not be permitted to take effect, we may hope that each departmentof the government, accustomed to move in its legitimate sphere, with uniformity and harmony, will not readily run into excess, even in times of excitement and parly strife. Public opinion too, accustomed to yield to the authority of judicial decisions, and to sustain the courts, even when they arrest the operation of a legislative act, will acquire a wholesome morality and a firm tone by which the courts will feel sustained and encouraged in the discharge of their duty, should the time ever come when the-sanctuary of justice will be the last hope of the oppressed. Every case, therefore, where the constitutionality of a legislative act is drawn in question, is a grave and important matter, and while on the one hand the courts ought to entertain for the legislature the highest respect, and to decide against their acts only from the clearest convictions of duty; on the other hand, where they are clearly satisfied the consitution is violated, they have no alternative but to declare that such act of assembly is not law.
The act of assembly under consideration is attempted to be sustained upon'two grounds, 1st. that the complainants whose estate was sold were infants, and that the legislature in passing the act were in the exercise of a guardianship over them, and 2nd, that the sale was necessary to pay the debts of the ancestor.
*73 In the case of Rice vs. Parkman, chief justice Parker puts the exercise of the power to pass such laws on the ground that the parties interested are infants, and that the government is bound to exercise a guardianship over them. In Massachusetts the exercise of such a power by the legislature, is derived from the construction the court gives to their constitution, in which it is provided, (see same case 12 Mass. 334,) that the legislature shall have full power and authority from “time to time to make, ordain and establish all manner of wholesome and reasonable orders, laws, statutes and ordinances, direc'tions and instructions, so that the same be not repugnant or contrary to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects thereof.” These powers are very extensive, and some of them would seem to partake of a judicial character; but no such powers are conferred by our constitution on the legislature. It confers on the general assembly all legislative powers. No act can be passed which is not of a legislative character. But the habits of thinking in Massachusetts seem to have led to the concession that the powers of the legislature were analogous to those that are exercised by Parliament. In the opinion under review, the judge says, “this is a power frequ^atly exercised by the legislature of tins State since the adoption of the constitution, and by the legislatures of the province, and of the colony while under the sovereignty of Great Britain, analogous to the power exercised by'the British Parliament on similar subjects, time out of mind.”- Now it is manifest that the exercise of such a power by the British Parliament is no precedent by which our legislature should be governed. Parlia--mentis omnipotent, it can do any thing not naturally impossible. Great Britain has no constitution established by the sovereign will of the people and paramount to the legislative power of Parliament; so far from it, that Parliament can change what they call their constitution, and hence it follows that it is above the constitution. Not so with us. The people have established the consitution as the fundamental and paramount law. The government is divided into co-ordinate departments. The legislature constitutes one of those departments, and is as much restrained and bound to move in its *74 prescribed sphere, as either the executive or judicial. The . . J therefore which draws from the practice of Parliament an argument in favor of the power contended for in our legislature must be wrong.
The same opinion (page 331,) advances another palpable political fallacy to sustain this power. The judge sa3rs, speaking of the relative powers of the courts and of the legislature, “The constituent, when he has delegated an authority without an interest, may do the act himself which he has authorised another to do, and especially when that constituent is the legislature.” This assumption places the legislature above the judiciary and constitutes it the sovereign. It is wholly inconsistent with the theory of our government. Sovereignty resides in the people, and having delegated to the legislature, to the judiciary and to the executive, the exercise of that portion of it as co-ordinate departments which they have considered most fitting to be exercised by each, they retain themselves the exclusive paramount sovereignty. So far then from the legislature being the constituent of the courts, the people are the only constituents, and all the officers of the government in all the departments are their agents.
The f^pt chat the constitution may prescribe that the mode of appointing the judges shall be by the legislature, does not constitute the legislature the constituent. If so, the electors of president and vice president of the United F tales would be the only constituents of those functionaries. And as in some of the States, judges are appointed by the governor, in others by the legislature, and in others by the people directly, the constituency in each of these cases varying, the judges would be alternately at the feet of the legislature, the govern- or and the people. But no such absurdity exists, and the statement of the proposition must have resulted from inattention to the form of our state and federal governments.
It follows from this view of the subject, that the legislature is not sovereign, that it is not the constituent of the courts, nor are they its agents; and that any assumption by the legislature of powers conferrred by the constitution upon the judiciary, is as destitute of authority as it would be in the courts, were they instead of adjudging what the law is, to undertake *75 the exercise of legislative powers, and to prescribe what it shall be. These observations are made in order to show as the sovereignty does not rest in the legislature, the power to exercise a guardianship over the estates and persons of infants, does not exist in that body. It is the duty, certainly, of the government to protect and provide for those who are incapable of taking care of themselves; but it is the duty of the legislature to pass general laws whereby this may be done. We cannot concur with chief justice Parker, that the legislature “might resume the burthens of (.his business to itself,” and perform all the duties of guardian for all the infants in the country. However that might be in Massachusetts in virtue of the very extensive powers granted to the legislature by their constitution, it cannot be the case here. For the same judge (page 331,) declares, “It is not legislation which must be by general acts and rules, but the use of a parental and tutorial power for purposes of kindness, wi.thout interfering with, or prejudice to the lights oí any but those who apply for specific relief.” Now if such acts are not acts of legislation, and the judge here declares they are not, then as we have seen, our legislature cannot constitutionally pass them, for it has none other than legislative powers, except in those particular cases where other powers are expressly conferred. The legislature must therefore enact general laws for the protection of infants and the management of their estates, and it can with no more propriety refuse to do so, than after such laws are passed, the courts can refuse to hear and determine the matters properly submitted to them. It results from what has been said, that the case of Rice vs. Parkham, is not an authority in this case. If there were no other objection to considering it as such, the dissimilarity of the two cases would prevent its application. There the infants were not deprived of their property by the legislative act, but it was only transmuted from real to personal property, manifestly to their advantage. Here, the property descended to these heirs, has been sold to satisfy debts for which they had not been rendered liable, and for the payment of which they had a right to require the application of the whole personal estate before their lands could be charged. such a case as this, the court whose opinion has been.so often *76 ie^ene^t0’ wou^ nothave sustained the act. They say “no imagines that under this general authority the legislature could deprive a citizen of his estate or impair any valuable *• L J contráctil! which he might be interested.”
The other ground upon which the competency of the legislature to pass such laws is maintained is, that the sale was necessary in order to raise a fund to pay the debts of the ancestor. It is upon this ground that the supreme court of the United States puts the case of Wilkinson vs. Leland, 2 Peters 658. Butin that case, the'court declares that the devisee took the land, subject to the lien of creditors; that the act divested no rights “except in favour of existing liens of paramount obligation,” and that it was “remedial in nature to give effect to existing rights.” This construction of the laws of Rhode Island places the case upon a principle wholly inapplicable to the case now before the court, It is settled law in this State, that the debts of the ancestor constitute no lien upon the lands descended, in the hands of the heir. The creditors of the ancestor had established no right to have satisfaction of their debts by the sale of this land. This act could not therefore be “remedial in its nature to give effect to existing rights.” When to this striking discrepency between the two cases, we take into consideration the fact that Rhode Island has no constitution containi lg restrictions upon the exercise of legislative power, it is manifest that this case has no application to the present one.
We will next notice the two cases from Kentucky, 4 Monroe’s Rep. 91, and 6 Mon. Rep. 592, cited by Judge Hickey in the opinion delivered by him in the case of Bedford’s guardian exparte, (Am. Ju. vol. 10, p. 297, The acts in both these cases were sustained upon the ground that the lands were appropriated to the payment of debts. Their application to this particular object, is the sole reason which the court (manifestly struggling to sustain them,) can give wherefore they were constitutional. This reason is clearly falacious. If it be lawful to sell by special act of assembly, the land of heirs for the payment of the debts of the ancestor, what reason can be given why with equal propriety the land of any citizen might not be subjected in the same way to the payment *77 of bis own debts. Let it be remembered that infancy is now out of the question. The broad proposition is that the of heirs may be subjected in this way to the payment of die ancestor’s debts whether these heirs be infants or adults; and why should this be when other debtors are only liable according to due course of law? Surely a man is as much bound to pay his own debts, as heirs can possibly be to pay the debts of their ancestor, and if he does not pay them- promptly, and the course of law by which to compel him is deemed too tedious, why may not the legislature pass a law directing his lands to be sold for their payment. Does not'the absurdity of such a proposition startle us, and yet it is identical in principle with that which is maintained in the two cases referred to. Again, as is well remarked by Judge Hickey, the constitutionality of the act upon this hypothesis, would depend upon the truth or falsehood of the suggestion, that the ancestor owed debts. The whole reasoning upon which these eases go, is so manifestly erroneous, that they are entitled to no weight. From this review of the cases relied on in the argument for the defendants, it results that neither the infancy of the complainants nor the fact that their land descended to them from their father whose debts were not all paid, gave the legislature any more power to direct a disposition of their estate in a manner not authorised by the genera] laws of the land, than exists in that body to dispose of the estate of any other citizen in the same way. That the legislature has power upon the suggestion, that a man owes debts, to pass an act directing the sale of his lands for their payment, no one would argue. And yet the exercise of such power would be less objectionable than the act in question. In this case the parties whose land was sold were not indebted. It was not certain that the debts due from their ancestor would ever become a charge on their lands. By this sale then their real estate is taken away and applied to the payment of debts they did not owe, not by the judgment of their peers, not by the law of the land; but by a special, partial act of the legislature, applicable to their case alone.
Since the case of the Bank vs. Cooper, 2 Yer. 599, several cases have occurred and have been decided by this court, upon the principles of that case, In that case it was decided. *78 that the legislature had no power to pass a law, constituting a special tribunal for the trial of a particular class of debtors to the bank, by process not known to the general law and without the right of_appenl. This cause was soon followed by the case of Walley's heirs vs. Kennedy, 2 Yer. 554, in which it was determined, that an act authorizing the court to dismiss Indian reservation cases, where they were prosecuted for the use of another, was a partial law, and unconstitutional. Next to this was the case of Tate vs. Bell, 4 Yer. 202, in which it was decided, that an act of assembly, authorizing the executors of William Tate to revive a judgment, which had been obtained by Geo. Beil .in his life time, in their names, by sci.fa. against Montgomery Bell, wrns partial in its character, was not the law of the land and was void. In the case of Officer vs. Young, 5 Yer. 320, it was decided, that an act authorizing James Young to prosecute a suit then pending in the circuit court of White county, in the name of Peter Elrod vs. Robert Officer, without taking out letters of administration upon the estate of Peter Elrod, deceased, was unconstitutional and void. These cases were all decided upon the same general principle, that the several laws upon which they arose, were partial in their operation, acting only on special cases, and tending to deprive the parties to be affected by them, of their rights and property. The same principle applies to the case under consideration, with as much force as it does to either of the cases referred to. The act under consideration is equally special, equally restricted in its operation, and tends more directly to deprive the parties to be affected by it, of their pioperty, than either of the acts above referred to. It is not, therefore, the law of the land, and is void.
Several cases have been referred to, where special laws have been declared constitutional by this court; such as the case of Williams vs. Norris, 12 Wheaton: Ann Hope vs. Johnson, 2 Yer. 123, and Vanzant vs. Waddle, (2 Yer. 260. These cases were all determined upon the principle, that they deprived no one of a right, but were enacted to advance the remedy of a party, whose right already existed. If they were susceptible of that construction, and we think *79 they were, then no one would doubt their conslitutionality. They would not be subject to the objection, which exists the present case.
In the case of Fisher’s negroes, 6 Yer. 119, we have an illustration of the difference between these two principles, involved in special acts of assembly. Fisher’s negroes had been emancipated by his will, but in order to the enjoyment of their freedom, it was necessary, by the act of 1801, c 27, that a petition be presented to the county court, and upon its judgment, that their emancipation would be consistent with the interest and policy of the state; a bond and security were required to reimburse the county any damages it might sustain by the emancipation, in 1829, an act was passed, allowing slaves, who were emancipated by will, in case the executor should refuse to file the petition, and give the security required by the act of 1801, to file their bill in equity, and if the court should be of opinion, that said slaves ought of right to be free, it was required so to order. Fishers ne-groes filed their bill under this act, and while it was in progress, the legislature passed the act of 1831, c 101, declaring that the act of 1829 should not be construed, so as to extend to any case existing before the passage of the act, but that in &11 such cases, where bills should be pending under said act, it should be the duty of the chancellor, at the first term of his court, to have the same stricken from his docket. The chancellor refused to dismiss the bill as directed, upon the ground that the first act gave the negroes rights which the legislature had no authority by the second one to take away. It is true these acts, although probably intended for a particular case, are in form general laws. They nevertheless illustrate the principle upon which legislation may properly proceed m such cases. The chancellor’s decree in this case was affirmed in this court. In the opinion of the court, as between master and slave, the will gave to the ne-groes a right to their freedom, and nothing was wanting to their enjoyment of that right but the consent of the government. This consent the legislature might give direct1)', by an act applying to the particular case, or they might%y law vest the judicial tribunals with power to give it. No right was *80 ta^en away by it- The negroes having been emancipated by will, Fishers distributees had no right to them. The act communicated a benefit to them, without impairing the right of any other person. Not so the act of 1831. That act was special. It only applied to cases where bills had been filed under the act of 1829, for the emancipation of negroes, who were liberated by will before the passage of this act. These it required should be dismissed from the chancery court, and no adequate mode of trial existed elsewhere. The court said that the effect of the act would be, to destroy the right communicated by the act of 1829, and that doing so, it was unconstitutional.
3d. It is insisted that these infants were instrumental in procuring the passage of this act of assembly, whereby the defendants wrere induced to advance their money for this land, and that it is a fraud in them now to take advantage of a want of power in the legislatnre to pass the law, and so to defeat the defendants title. Upon an examination of the proof, it does not appear that they had any agency in obtaining the passage of the act. One witness only speaks upon the subject, and he in answer to a leading question, indicates that the subject was spoken about in the family, without pretending that the children had any agency in getting up the petition to the legislature. But if they had *done so, wo are unable to perceive upon what ground they could be charged with iraud. If an infant sell his estate, making the most solemn promises to confirm the title when of age, Ills subsequent disaffirmance of it would be no fraud. A sale under .a legislative act, procured at his instance, would surely be no.more obligatory on him than one made by himself without such act. The same want of discretion which renders him unfit to be trusted in the sale of his property, would exist to the same extent in the other case, and incapacitate him from a discreet exercise of judgment as to the proposed application to the legislature. If this argument could prevail, no infant would be safe in his possessions. It would be easy for the party wishing to purchase his estate to induce him to apply to the legislature for the passage of an act, authorizing its sale; and after the sale would be effected, he would be told, that al *81 though the act was void, yet a disaffirmance of the sale on his part would be a fraud. Thus would be accomplished indirectly that which the law prohibits from being done directly.
4th. We next como to consider the question, whether the statutes of limitations operates in the cause, as to either complainant, and to what extent.
The possession was taken by Perry, the 1st January, 1827; but it is contended that there is no evidence that there was a continued possession for seven years. The proof of witnesses is unsatisfactory upon this subject. But there is no necessity for resorting to witnesses, as the pleadings sufficiently show how the facts are. The bill alledges that there was no such continued possession for the length of time necessary to form the bar, and seeks a discovery of the defendants upon this subject by interrogatories, requiring them to state how the fact is. The answer of Perry states, that he took possession of the land about 1st January, 1827, by his overseer and negroes, and moved to it, and took possession by himself and family in August of the same year, and remained on it till the month of May, 1831. He then moved his white family to Pulaski, and remained in Pulaski until 1st day of January, 1834, when he moved his family and again settled on said land, during all which time he had peaceable possession by his overseer and ne-groes. The complainants, by seeking a discovery of the defendant, have made him a witness upon this subject, and they cannot object to his testimony, when it makes against them.
5th. The possession having been proved, the next question is, how and 'against whom does it operate. The deed executed by the Jones’ to the Steels, was dated the 23rd of May, 1826, and registered 25th of February, 1S29. This suit was commenced the 24th day of February, 1835. Seven years did not elapse from the time the deed was registered, up to the time of the commencement of the suit. Whether, therefore, the first section of the act of limitations of 1819, c 28, will'operate to bar the complainants’ claim, is a question of some doubt, and which it is not necessary to decide, *82 We shall therefore consider the case, in reference to the second section of said act. John R. B. Jones, the oldest of the complainants arrived at the age of twenty-one years, the 20th January, 1828. Jane R. White became' of age the 1st day of November, 1829, but she was married to her present husband, Benton R. White, before 1st January, 1827; and Nancy M., the youngest of the complainants, did not become of age until 11th September, 1832. From these facts it appears, that John R. B. Jones is the only one of the complainants against whom the statute of limitations opei’ates; and the next inquiry is, to what extent does it operate against him.
The complainants’ counsel insists, that as the defendants possession is only protected by virtue of the second section of the act of 1819, it can operate in his favor only to the extent of his actual inclosuies. In support of this position the case of Dyche vs. Gass’ lessee, 3 Yer. 397, is cited and and relied on. That case does not support the position contended for. That was a caso of naked possession, unaccompanied by title, legal or equitable, valid or invalid. It is true, Dycbe, after he had bean some years in possession, procured an informal deed, covering his possession; but from the dato of that deed, seven years had not elapsed before the suit was brought. The case therefore was decided, as though the deed had never existed; and there appearing nothing in the case by which to determino the extent of the possession, save the enclosures actually made, the court determined that the possession must be restricted to such enclosures. In the opinion of the court, it is true it is said, “It is most difficult to distinguish between a defendant, in some appearance of claim, evidenced by writing of no v&lidity in law or equity, and one holding as a trespasser, without excuse.” These remarks doubtless misled his honor, the chancellor, and in? duced him to place this case upon the foot of a naked possession, It may be observed here, that the remarks above quoted were not called for by the facts of the case, and do not constitute a decision of the question, indicated by them. But if it be true, that one who is in possession, holding under an informal writing of no validity, either in law or equity, *83 would be restricted to bis actual enclosure, it does not follow? that such would be the case in relation to a party holding bjj virtue of a title bond, or an unregistered deed. On the contrary, we think it clear, that a party who is in possession for seven years of a tract of land, holding it adversely, under and by virtue of an unregistered deed, is protected by the second section of the act of 1819, to tho extent of the boundaries of his deed. Why may not this he so? He certainly takes possession claiming to hold to that extent. Is there not the same reason why he should he considered as so holding, that exists in favor of such construction of a lessee’s possession. It does not require a legal title, in order that the possession of a party shall be construed to extend beyond his actual inclosure. Possession taken under an equitable title, by which the boundary is defined, of a part, will be construed to extend to the whole in the same way that it would had the title been a legal one. We think, therefore, that as the complainant, John R. B. Jones, was twenty-one years of age more than three years before this suit was brought, he is barred of any recovery whatever in this case.
.6. The next question is, as to the jurisdiction of this court. The defendants claim title to the lam! in controversy, by virtue of a void deed, and the complainants seek to have said deed delivered up to be cancelled. It is settled in this state and elsewhere, that a court of equity has the power to order a deed, bond, or other instrument, to he delivered up to be cancelled, if the same be void, whether its .character as such appear from the face of the instrument or otherwise. Hamilton vs. Cummings, 1 John. Ch. Rep. 517: Bromley vs. Holland, 7 Ves. 19: 1 Hovenden’s Sup. 17: see also Johnson vs. Cooper, 1 Yer. 524, 530, and Richmond vs. McMinn, 6 Yer. Rep. Having obtained jurisdiction of the cause for this purpose, the court will retain it, until the whole matter is disposed of, and the rights of the parties settled.
7th. The complainants pray that the defendants be compelled to account for the rents and profits since they have had possession of the premises.
They are unquestionably entitled to an account as prayed *84 •for; bul we are of opinion that in taking that account the defendants should be allowed for any valuable and permanent improvements they may have made, so that such allowances do not exceed the rents and profits for which they are chargeable.
The decree of the chancellor will be reversed and reform-ed according to the principles of this opinion.
Decree reversed-.